IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| International Association of Machinists and Aerospace Workers and South Carolina American Federation of Labor and Congress of Industrial Organizations, | ) ) ) ) | Civil Action No.: 2:11-cv-00153-CWH |
| | ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **ORDER** |
| Nimrata "Nikki" Haley in her official capacities as Governor-elect and as Governor of South Carolina, and Catherine Templeton in her personal capacity and in her official capacity as Director of the South Carolina Department of Labor, Licensing and Regulation, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## I. BACKGROUND

This matter is before the Court on the defendants' motion to dismiss and motion to strike (ECF No. 19). For the reasons set forth in this order, the motion to dismiss is granted. The motion to strike is moot.

### A. FACTS

On a motion to dismiss, the Court accepts as true the well-pleaded facts of the plaintiffs' complaint. The second amended complaint (ECF No. 43) is the operative complaint in this case. The plaintiffs attached several news articles to their original complaint (ECF No. 1), and since the operative complaint refers to these exhibits, the Court will consider them. See Jeffrey M.



Brown Assocs., Inc. v. Rockville Ctr., Inc., 7 F. App'x 197, 202-203 (4th Cir. 2001) (per curiam).

This action was filed by two labor unions, the International Association of Machinists and Aerospace Workers ("IAMAW") and the South Carolina American Federation of Labor and Congress of Industrial Organizations ("South Carolina AFL-CIO"). The IAMAW formerly served as the exclusive bargaining representative for aerospace industry employees in South Carolina, including employees at the Vought aerospace manufacturing facility in North Charleston. Compl. ¶ 12. The Boeing Company ("Boeing") acquired the Vought facility in July of 2009, and in September of 2009, the workers at the facility voted to decertify the union. Id. Nevertheless, the IAMAW has continued its efforts to organize workers at Boeing's facility. Id. The South Carolina AFL-CIO supports organizing activity and engages in legislative and political advocacy on behalf of members of affiliated unions. Id. ¶ 5. It actively and publicly participated in the campaign to retain the IAMAW as the representative of workers at Boeing's facility in North Charleston. Id. ¶ 13.

On November 2, 2010, the defendant Nimrata "Nikki" Haley was elected the 116th Governor of South Carolina. On December 8, 2010, Governor-elect Haley held a press conference where she nominated the defendant Catherine Templeton to serve as the Director of the South Carolina Department of Labor, Licensing and Regulation ("LLR"). Id. ¶¶ 19-20. In the course of her announcement, Governor-elect Haley made the following statement:

> LLR is going to have a large role over the next couple of years, one being with the unions, and that is the fact that we think we are going to have a union fight, as we go forward, with Boeing, and you are right now looking at the only female in the nation that has fought the largest UAW push that we've been through, and so she is ready for that, she is ready for the challenge, she knows what it takes to take it on, and she understands that it's going to be a partnership level that we cannot lose.

#2
UCH

Id. ¶ 19.  A reporter asked Templeton to explain LLR's "role" in the "expected union fight" at

Boeing.  Templeton responded:

> In my experience I have found there is not one company that operates more
> efficiently when you put another layer of bureaucracy in. … We will do
> everything we can to work with Boeing and make sure that their workforce is
> taken care of, that they run efficiently and that we don't add anything
> unnecessarily.

Id.  Governor-elect Haley then added, "We are going to fight the unions, and I needed a partner

to help me do it; [Templeton is] the right person to help me do it."  Id.  The defendants' remarks

were widely reported in the media.  Id. ¶ 20.

Following the December 8, 2010 press conference, LLR issued a press release on its

website, which read in part:

> Templeton has been involved in union avoidance for the past 14 years.  She has
> extensive experience in national labor campaigns against the UAW, IBEW and
> Teamsters.  In fact, her campaign was the most notorious UAW campaign in
> decades.  She is currently on Ogletree's EFCA Team providing extensive training
> throughout the country on the Employee Free Choice Act.  In addition to her
> experience with the larger and older labor unions, she has specific knowledge
> about the various labor organizations actively targeting the healthcare industry.

Id. ¶ 22.  During her confirmation hearing, a state senator asked Templeton whether she had been

ordered to crack down on labor unions.  She responded, "Well, I've been very fortunate so far

that my marching orders are to just do it right."  Id. ¶ 24.

Nikki Haley was sworn in as Governor on January 12, 2011, and, the following day,

Templeton was confirmed as the Director of LLR.  Id. ¶ 23.  On January 20, 2011, Governor

Haley's spokesman publicly asserted that it was Governor Haley's job to enforce South

Carolina's right-to-work laws and protect workers from having to join labor unions.  Id. ¶ 26.

On January 20, 2011, Templeton made a public statement in which she said, "Let me be very

clear . . . this is an anti-union administration."  Id. ¶ 25.  She continued, "We don't want Boeing



or anybody else to introduce extra bureaucracy into the administration." Id. On January 21, 2011, Governor Haley publicly stated, "There's no secret I don't like the unions . . . . I will do everything I can to defend that fact that we are a right-to-work state . . . . We are pro-business by nature. I want us to continue to be pro-business." Id. ¶ 27.

On April 21, 2011, Governor Haley appeared on a radio talk show. In the course of her interview, she said, "[W]e protect and allow the employers to have the right to have . . . communications directly with their employees and not have the unions get involved." Id. ¶ 28. On April 26, 2011, Governor Haley held a press conference to mark her 100th day in office. During the press conference, she said, "And more than anything we are a right-to-work state. We keep the unions out." She later added, "We are not going to allow unions to come into this state." Id. ¶ 29.

The plaintiffs maintain that the defendants' various statements evidence an agreement between Governor Haley and Director Templeton to use the machinery of state government to prevent workers from joining or organizing unions or advocating for unions. Id. ¶ 21. The plaintiffs contend that as a result of the defendants' comments, their efforts to organize workers have been frustrated because employees have been increasingly reluctant to discuss working conditions and union association with each other or with union representatives. Id. ¶¶ 33, 36.

**B. REQUESTED RELIEF**

The plaintiffs allege that their members and potential members are suffering and will continue to suffer irreparable harm as a result of the defendants' threats. Id. ¶ 62. Thus, the plaintiffs request that the Court award the following relief:

(1) A declaration by the Court stating that threats to "fight unions," the execution of a policy hostile to free association in unions, acts which subject unions and workers who seek to associate by joining a labor organization to heightened scrutiny of those organizational and representational activities through the agencies of state

government, and retaliation against unions because of their advocacy and associational activities and against workers because of their support for unions violate the First and Fourteenth Amendments to the United States Constitution, violate the plaintiffs' and their members' and potential members' express and implied statutory rights under the [National Labor Relations Act] NLRA, and deprive the plaintiffs and union-represented and non-represented workers who are potential union members of equal protection of the law, and of liberty without due process in violation of the Fourteenth Amendment to the U.S. Constitution.

(2) An order enjoining the defendants from interfering with the plaintiffs' rights guaranteed by the NLRA and by the First and Fourteenth Amendments to the United States Constitution.

(3) An order requiring the defendants to execute an undertaking in which they commit: (a) to refrain, and to direct LLR to refrain, from violating the statutory and constitutional rights of workers in South Carolina to form, join and assist labor unions, and to engage in other concerted activities for the purpose of mutual aid or protection; (b) to remain neutral, and to direct LLR to remain neutral, in enforcing all state labor and employment laws; (c) to remain neutral, and to direct LLR to remain neutral, regarding labor-management relations between employers, workers and unions within the state of South Carolina, including but not limited to, organizing campaigns, petitions for certification of a union, petitions for decertification of a union, grievances and unfair labor practices; and (d) to remain neutral, and to direct LLR to remain neutral, regarding collective bargaining negotiations.

(4) An award of costs, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988(b).

(5) Other and further relief as the Court deems proper.

Id. at 17-18, ¶¶ 1-5.

## C. SOUTH CAROLINA'S RIGHT-TO-WORK LAW

South Carolina's right-to-work law is set forth in Title 41, Chapter 7 of the South Carolina Code. The law provides that "the right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization." S.C. Code Ann. § 41-7-10 (1976). It prohibits employers from requiring an employee to join a union or to pay union dues, or to refrain from doing so, as a condition of employment. Id. § 41-7-30. It also prohibits individuals or groups from interfering with an individual's right to work through the



use of threats or picketing of a violent or obstructive nature. Id. § 41-7-70. Section 41-7-90

creates a private cause of action for those adversely affected by the violation of these provisions.

Additionally, a violation of the right-to-work law is a misdemeanor "punishable by

imprisonment for not less than ten nor more than thirty days or by a fine of not less than ten nor

more than one thousand dollars or by both . . . ." Id. § 41-7-80.

The Director of LLR is charged with enforcing the right-to-work law. Id. § 41-7-75. In

connection with this duty, the Director is authorized to hold hearings and to enter places of

employment for the purpose of conducting an investigation. Id. The Director may assess a $100

fine for each violation of the right-to-work law, id. § 41-7-100; however, she is not authorized to

initiate criminal charges. Article V, § 24 of the South Carolina Constitution provides that "[t]he

Attorney General shall be the chief prosecuting officer of the State with authority to supervise

the prosecution of all criminal cases in courts of record." The South Carolina Supreme Court has

held that this provision "vests sole discretion to prosecute criminal matters in the hands of the

Attorney General." State v. Peake, 579 S.E.2d 297, 300 (S.C. 2003). Finally, this Court can find

no South Carolina authority which would permit the Governor to levy civil penalties or initiate

criminal charges for violations of the right-to-work law.

**D. PROCEDURAL HISTORY**

On January 20, 2011, the plaintiffs filed their first complaint (ECF No. 1). On February 3,

2011, the defendants filed a motion to dismiss the plaintiffs' complaint for lack of subject matter

jurisdiction and failure to state a claim upon which relief can be granted (ECF No. 5). In lieu of

a response, the plaintiffs filed their first amended complaint (ECF No. 13) on February 18, 2011.

The first amended complaint incorporated statements made by the defendants after assuming

their official positions and advanced a cause of action against Templeton in her personal



capacity.  On March 3, 2011, the defendants moved to dismiss the plaintiffs' amended complaint

and to strike all allegations related to events that occurred before the defendants took office or

after the original complaint was filed (ECF No. 19).  After receiving an extension of time, the

plaintiffs responded in opposition on March 28, 2011, and the defendants replied on April 6,

2011.  On May 4, 2011, the plaintiffs moved to file a second amended or supplemental complaint

(ECF No. 29), which alleged additional statements by the defendants.  The defendants opposed

the amendment.

　　The Court held a hearing on June 13, 2011, to consider the plaintiffs' motions to amend the

complaint and the defendants' motions to dismiss and to strike.  The Court granted the plaintiffs'

motion for leave to file the second amended or supplemental complaint and then heard the

parties' arguments on the motions to dismiss and to strike.  The Court treated the proposed

second amended or supplemental complaint—which was attached as Exhibit 1 to the plaintiffs'

motion for leave (ECF No. 29)—as the operative complaint.  The plaintiffs did not file their

second amended complaint (ECF No. 43) until July 25, 2011.  Except for different captions, the

second amended complaint (ECF No. 43) is identical to the proposed second amended or

supplemental complaint (ECF No. 29-1), so although the Court initially treated ECF. No. 29-1 as

the operative complaint, its findings apply equally to ECF No. 43 because the documents are

substantively identical.

　　On July 8, 2011, the plaintiffs submitted a copy of the Supreme Court's recent decision in

Sorrell v. IMS Health Inc., 131 S. Ct. 2653 (2011) to supplement their response in opposition to

the defendants' motion to dismiss (ECF No. 40).  On July 15, 2011, the defendants submitted a

short response, arguing that Sorrell is inapplicable to this matter and should not alter the Court's



analysis.  Having thoroughly reviewed the opinion, the Court agrees with the defendants that

Sorrell is inapposite to the case at bar.

## II. DISCUSSION

### A. STANDARD ON A MOTION TO DISMISS

A plaintiff's complaint should set forth "a short and plain statement . . . showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 8 "does not require 'detailed factual

allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v.

Twombly, 550 U.S. 544, 555 (2007)).  To show that the plaintiff is "entitled to relief," the

complaint must provide "more than labels and conclusions"—"a formulaic recitation of the

elements of a cause of action will not do."  Twombly, 550 U.S. at 555.  As the Supreme Court

explained in Iqbal, "Rule 8 marks a notable and generous departure from the hyper-technical,

code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff

armed with nothing more than conclusions."  129 S. Ct. at 1950.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. at 1949 (quoting

Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 129 S. Ct. at 1949.  The facts alleged "must be enough to raise a

right to relief above the speculative level," Twombly, 550 U.S. at 555, and "must produce an

inference of liability strong enough to nudge the plaintiff's claims 'across the line from

conceivable to plausible.'"  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250,

256 (4th Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1952.  "[W]here the well-pleaded facts do not



permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)). "This basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2005)).

In evaluating a motion to dismiss under Rule 12(b)(6), the Court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff . . . ." Nemet Chevrolet, 591 F.3d at 255. This rule is "inapplicable to legal conclusions." Iqbal, 129 S. Ct. at 1949. Moreover, "elements of a cause of action" and "bare assertions" do not qualify as well-pled facts, and the Court "need not accept as true unwarranted inferences, unreasonable conclusions or arguments." Nemet Chevrolet, 591 F.3d at 253, 255 (quotation marks and citations omitted). The Court may take judicial notice of matters of public record and may also "consider documents attached to the complaint . . . as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Sec'y of State for Def. v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007) (quotation marks and citations omitted).

The plaintiffs allege that the defendants made a series of statements that burden the exercise of the plaintiffs' statutory and constitutional rights. The plaintiffs contend that they have alleged "actions" as well as statements, but the Court must draw a distinction between true factual allegations and "labels and conclusions." Twombly, 550 U.S. at 555; Iqbal, 129 S. Ct. at 1949. For instance, the plaintiffs argue that Governor Haley's statements establish a state policy hostile to unions and allege that the defendants have "maintained and enforced" this policy.



Although the plaintiffs submitted three versions of their complaint over the course of three-and-a-half months, they have yet to allege a single <u>act</u> of adverse regulation against a union or worker.  Labeling the defendants' comments a "policy" does not convert words into actions or add an additional factual allegation to the plaintiffs' complaint.  While the plaintiffs predict that they will face "heightened scrutiny" and "hostile government action," they do not allege that they actually have been subjected to either.

In summary, this Court assumes that the defendants made the statements set forth in the plaintiffs' complaint and the news articles referenced therein.  Additionally, the Court accepts as true all of the facts alleged by the plaintiffs regarding the context in which these comments were made.  The Court does not, however, accept the plaintiffs' argument that the defendants' broad statements create a "state policy" or their bare assertion that the defendants have actually "implement[ed]" such a policy.  Consequently, the Court's analysis will focus upon the impact of the defendants' statements on the plaintiffs' rights.  This calls for an objective analysis that can be resolved as a matter of law.  See <u>Baltimore Sun Co. v. Ehrlich</u>, 437 F.3d 410, 416 (4th Cir. 2006).  Although the plaintiffs are entitled to have all inferences drawn in their favor, the Court is not required to blindly accept the plaintiffs' interpretation of the defendants' statements.  Were it otherwise, it would be virtually impossible for a court to dismiss a § 1983 First Amendment claim against a state official.

## B. REQUIREMENTS OF § 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) that he or she "has been deprived of a right, privilege or immunity secured by the Constitution or laws of the United States" and (2) that the deprivation "was committed by a person acting under the color of state law."  <u>Dowe v. Total Action Against Poverty in Roanoke Valley</u>, 145 F.3d 653, 658 (4th Cir.



1998).  The "color-of-state-law" requirement is "identical" to the Fourteenth Amendment's "state action" requirement.  Lugar v. Edmonson Oil Co., 457 U.S. 922, 929 (1982).  The "state action" and "color-of-state-law" requirements exclude claims for "merely private conduct, no matter how discriminatory or wrongful," Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999) (quotation marks and citations omitted), and mandate that the acts alleged "be fairly attributable to the state."  DeBauche v. Trani, 191 F.3d 499, 506 (4th Cir. 1999) (quoting Lugar, 457 U.S. at 937)).  In doing so, these prerequisites "preserve[] an area of individual freedom by limiting the reach of federal law and federal judicial power."  Lugar, 457 U.S. at 936.

The Fourth Circuit has indicated that if § 1983 is to serve its purpose, "its ambit cannot be a simple line between States and people operating outside formally governmental organizations."  Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001)).  To satisfy the color of law requirement, "[t]he person charged must either be a state actor or have a sufficiently close relationship with state actors such that a court would conclude that the non-state actor is engaged in the state's actions."  DeBauche, 191 F.3d at 506.  "[T]here is 'no specific formula' for determining whether state action is present."  Holly v. Scott, 434 F.3d 287, 292 (4th Cir. 2006) (quoting Hicks v. S. Md. Health Sys. Agency, 737 F.2d 399, 402 n.3 (4th Cir. 1984)).  "[T]he question of what is fairly attributable to the State 'is a matter of normative judgment, and the criteria lack rigid simplicity.'"  Rossignol, 316 F.3d at 523 (quoting Brentwood, 531 U.S. at 295).

Courts and commentators have articulated several tests under which "the state-action label" may be applied to private actors.  These tests include: the "symbiotic relationship" test (the state profits from a private wrong); the "public function" test (a private party performs a



function that is traditionally the "exclusive prerogative of the state"); the "close or joint nexus" test (the state orders, coerces, or significantly encourages private action); the "joint participation" test (a private citizen conspires with a state actor to violate constitutional rights); and the "pervasive entwinement" test (the identity of the state and private actors largely overlap)." See Federal Judicial Center, Martin A. Schwartz & Kathryn R. Urbonya, Section 1983 Litigation 88-93 (2d ed. 2008) cited in Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 181 n.6 (4th Cir. 2009). Additional relevant factors include whether the alleged injury is "aggravated in a unique way by the incidents of governmental authority," "the extent and nature" of any public assistance or benefits received by the private individual or entity, "the extent and nature of governmental regulation over the institution," and "whether the state itself regards the actor as a state actor." Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 342-43 (4th Cir. 2000) (quotation marks and citations omitted).

While the tests and factors identified above provide a helpful list of considerations, a court's determination should ultimately be informed by the totality of the circumstances and turn on whether the state is sufficiently involved in the alleged activity to justify treating the conduct of a private individual as state action. See, e.g., Philips, 572 F.3d at 184 (quoting Brentwood, 531 U.S. at 295) (quotation marks omitted) ("[R]egardless of the category referenced, . . . the totality of the circumstances . . . is determinative and . . . all roads lead back to a finding of state action 'if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may fairly be treated as that of the State itself.'").

In the present case, the defendants' statements can be divided into three categories: (1) statements made by Governor Haley and Director Templeton; (2) statements made by Governor-elect Haley; and (3) statements made by Templeton prior to her confirmation.



**1. Statements Made by Governor Haley and Director Templeton**

Governor and Director of LLR are offices of state government, so the defendants were clearly "state actors" once they assumed these positions. See DeBauche, 191 F.3d at 506. Thus, the Court concludes that Haley's post-inauguration statements and Templeton's post-confirmation statement were made under color of law.

**2. Statements Made by Governor-elect Haley**

The plaintiffs also have advanced facts sufficient to allow the Court to infer that the statements attributed to Governor-elect Haley were made under color of law. First, in South Carolina, the Governor-elect is arguably a state official whose role is recognized under state law. The South Carolina Constitution contains provisions for succession when the Governor-elect dies, declines to serve, fails to qualify to serve, or is unable to serve for some other reason. S.C. Const. art. IV, §§ 6-7. South Carolina law authorizes the Governor-elect to sit at meetings of the Joint Appropriations Committee of the General Assembly and gives her the right to be heard on all matters coming before the Joint Committee. S.C. Code Ann. § 11-11-90. Moreover, the state funds the Governor-elect's transition team, which allows her to begin the process of assembling her administration. H. 4657 § 90.16, 118th Gen. Assem. (S.C. 2010).

Even if the Court were to conclude that Governor-elect Haley was not a state official, it would still find that her statements were made under color of law. By appointing the head of an executive agency, Governor-elect Haley exercised powers exclusive to the chief executive. The fact that the announcement prompted the Department of LLR to post a news release on its website demonstrates that the "weight of the state" was behind Haley's actions, Howerton v. Gabica, 708 F.2d 380, 384 n.9 (9th Cir. 1983), and that the "state itself regard[ed] [Governor-elect Haley] as a state actor." Goldstein, 218 F.3d at 343. Her actions had such a strong nexus



with the state that her "behavior may be fairly treated as that of the [s]tate itself." Brentwood, 531 U.S. at 295. Thus, even if the Court characterized the Governor-elect as a private actor instead of a state official, it would still find that the plaintiffs have advanced facts sufficient to show that Governor-elect Haley's statements were made under color of law.[1]

### 3.  Statements Made by Templeton Prior to Her Confirmation

The plaintiffs do not contend that Templeton was a state official prior to her confirmation, but argue that she nonetheless was acting under color of law under the "public function" and "joint participation" theories. The Court concludes, however, that the plaintiffs have not advanced facts sufficient to state a plausible claim under either of these theories.

The "public function" theory "encompasses the 'exercise by a private entity of powers traditionally exclusively reserved to the State.'" Andrews v. Fed. Home Loan Bank of Atlanta, 998 F.2d 214, 218 (4th Cir. 1993) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974)). The plaintiffs maintain that Templeton engaged in a public function by announcing a "state regulatory and enforcement policy" and promising to execute Governor-elect Haley's "threats" against the unions. Pls. Mem. in Resp. to Defs.' Mot. to Dismiss 19-20, ECF No. 22.

---

[1] The defendants urge this Court to follow the Seventh Circuit's holding in Burrell v. City of Mattoon, 378 F.3d 642, 649 (7th Cir. 2004), but the Court finds the case distinguishable. In Burrell, a city clerk sued the mayor-elect and incoming city council members after the defendants told him that he would not be reappointed to his position when they took office the next day. The primary injury Burrell alleged was the loss of certain pension benefits, and to establish this injury, Burrell had to show that he had been fired the day before his term expired. The court held that, since the clerk actually lost his job as a matter of his term expiring, he had not been "deprived of his job [without due process, and] suffered no constitutional deprivation …." Id. at 648. Alternatively, the court held that the defendants "had not been inaugurated as required by City ordinance," and therefore "were not yet state actors." Id. at 649. The defendants could not have fired Burrell because they lacked the authority to fire anyone prior to their investiture. Conversely, at the time of the alleged statements, Governor-elect Haley had the authority to begin assembling her administration, a process that was funded by the state and facilitated by state officials as discussed above.



The Court does not agree. Templeton had no power to announce or implement a state policy prior to her confirmation and investiture. Furthermore, making a prospective promise to implement a particular policy or to support a public official in the enforcement of a policy is not a function that is "traditionally exclusively reserved to the State." Candidates for public office regularly make these types of statements, but they do not become state actors unless and until they are sworn-in or, at the very least, elected to hold office.

In this regard, Nominee Templeton is distinguishable from Governor-elect Haley. As the Governor-elect, Nikki Haley held an office recognized by the state constitution. At the time of the first alleged statements, her assumption of the office of Governor was predicated only on the formality of being sworn in at the expiration of her predecessor's term. Templeton, on the other hand, had yet to be confirmed by the Senate. Her nomination carried no guarantee of achieving the office of Director of LLR, and therefore, at the time, she was more similar to a political candidate than an elected official waiting to take office. For these reasons, the Court rejects the plaintiffs' public function theory with regard to Templeton.

Alternatively, the plaintiffs advance the "joint participation theory," under which a private party may be found to have acted under color of law by acting in concert with a state actor. DeBauche, 191 F.3d at 506-07. As the Fourth Circuit has observed, the Supreme Court has attempted to limit the joint participation theory and has explained that joint action or participation requires more than simply "private and public joint activity." See id. at 507. The fact that a political nominee appears alongside an elected official for a press conference does not establish joint participation, even though the nominee and the elected official will typically share some common goals. Because it is understood that a nominee must be confirmed by the legislative branch before exercising any power on behalf of the state, a nominee's statements

alone may not form the basis of a joint participation claim. Considering the totality of the circumstances based on the facts alleged by the plaintiffs, this Court concludes that Templeton was not acting under color of law prior to her confirmation.

In summary, the Court finds that the plaintiffs have advanced facts sufficient to state a plausible claim (1) that all of the statements attributed to Haley were made under color of law, and (2) that the post-confirmation statement attributed to Templeton was made under color of law. The statements Templeton made at the December 8, 2010 press conference and during her confirmation hearing were made in her personal capacity because her role in the Haley administration was still contingent upon approval by the South Carolina Senate. Thus, the Court concludes that Templeton's statements were not made under color of law. Nevertheless, out of an abundance of caution, this Court will include all of Templeton's statements in the substantive analysis to which it now turns.

## C. First Amendment Claims

First Amendment rights are implicated on both sides of this case. The plaintiffs' second cause of action alleges that the defendants violated the plaintiffs' First Amendment rights by chilling speech and associational activities aimed at promoting collective bargaining. Their third cause of action alleges that the defendants violated the plaintiffs' First Amendment rights by retaliating against the plaintiffs for representing workers and supporting unionization at the Boeing plant and throughout the state.

### 1. Legal Background

The right of workers to organize and advocate for favorable terms of employment is not merely protected by statute, it is guaranteed by the First Amendment. See Thomas v. Collins, 323 U.S. 516, 532 (1945) ("The right . . . to discuss, and inform people concerning, the



advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly."); Thornhill v. Alabama, 310 U.S. 88, 103 (1940) ("Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society."). Accordingly, state regulation of labor unions "must not trespass upon the domain set apart for free speech and free assembly." Thomas, 323 U.S. at 532.

Freedom of speech is also integral to a democratic system of governance. See Citizens United v. Fed. Election Comm'n, --- U.S. ----, 130 S. Ct. 876, 898 (2010) (observing that "[s]peech is an essential mechanism of democracy" because "it is the means to hold officials accountable to the people"); New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) (noting "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). The right to speak freely is indispensable to elected officials as well as their constituents. See Bond v. Floyd 385 U.S. 116, 135-36 (1966) (rejecting the idea that the First Amendment "only applies to the citizencritic of his government" and concluding that "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy"). Public officials do not abandon their First Amendment rights upon assuming office. See Republican Party of Minn. v. White, 536 U.S. 765, 781-82 (2002) (quoting Wood v. Georgia, 370 U.S. 375, 395 (1962)) ("The role that elected officials play in our society makes it all the more imperative that they be allowed to freely express themselves on matters of current public importance."); Block v. Meese, 793 F.2d 1303, 1314 (D.C. Cir. 1986) ("[C]ontrol of government



expression . . . is no more practicable and no more appealing, than control of political expression by anyone else.").

## 2. Chilling Speech

Government regulation need not be formal or explicit to violate the First Amendment. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67-68 (1963) (observing that "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around").  "Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated." Hammerhead Enters., Inc. v. Brezenoff, 707 F.2d 33, 39 (2d Cir. 1983).  The Fourth Circuit has held that "[g]overnment action [is] sufficiently chilling when it is 'likely [to] deter a person of ordinary firmness from the exercise of First Amendment rights.'" Benham v. City of Charlotte, 635 F.3d 129, 135 (4th Cir. 2011) (quoting Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005)).  This determination calls for an objective analysis, which "can be resolved as a matter of law." Baltimore Sun, 437 F.3d at 416; see also Constantine, 411 F.3d at 500 (reasoning that a subjective approach would expose public officials to inconsistent liability "depending on the plaintiff's will to fight").

## 3. Retaliation

The "right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000); see also Perry v. Sindermann, 408 U.S. 593, 597 (1972) (reasoning that "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect



be penalized and inhibited"). On the other hand, "not every reaction" to a citizen's speech is "actionable retaliation." Suarez, 202 F.3d at 685. Liability should be limited "when the challenged government action, whether conduct or speech, is so pervasive, mundane, and universal in government operations that allowing a plaintiff to proceed on his retaliation claim would 'plant the seed of a constitutional case' in 'virtually every' interchange." Baltimore Sun, 437 F.3d at 416 (quoting Connick v. Myers, 461 U.S. 138, 148-49 (1983)). Accordingly, to establish retaliation, the plaintiff "must show that the defendant's conduct resulted in something more than a 'de minimis inconvenience.'" Baltimore Sun, 437 F.3d at 416 (quoting Constantine, 411 F.3d at 500).

Furthermore, where the alleged government action is speech, the plaintiff's burden is heightened "to balance the government's speech interests with the plaintiff's speech interests." Baltimore Sun, 437 F.3d at 417. As the Fourth Circuit has explained:

> [S]ome government actions, due to their nature, are not actionable even if they satisfy all the generally articulated elements of a retaliation claim. When the challenged government action is government speech, there is no retaliation liability—even if the plaintiff can demonstrate a substantial adverse impact— unless the government speech concerns "private information about an individual" or unless it was "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow."

Id. at 416-17 (quoting Suarez, 202 F.3d at 689). See also Mo. Nat. Educ. Ass'n v. New Madrid Cnty. R-1 Enlarged Sch. Dist., 810 F.2d 164, 166-67 (8th Cir. 1987) ("School officials are free to express their views on unions and to urge teachers to join or not to join a union. As long as they refrain from threats or promises, their speech is protected under the first amendment.").

To establish a First Amendment § 1983 retaliation claim, a plaintiff must demonstrate (1) "that his or her speech was protected," (2) "that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech," and (3) "that a causal



relationship exists between its speech and the defendant's retaliatory action." Suarez, 202 F.3d

at 685-86 (quotation marks and citations omitted).  The plaintiffs allege that the defendants

retaliated against them for their representation of workers at Boeing and their efforts to organize

workers throughout South Carolina.  As noted above, the First Amendment protects union

advocacy, and thus the plaintiffs have satisfied the first requirement for purposes of a motion to

dismiss.  The Court also finds that the plaintiffs have alleged facts sufficient to survive a motion

to dismiss with regard to the third element—a causal connection between the plaintiffs' First

Amendment activity and the defendants' statements.

The plaintiffs' retaliation claim therefore turns on whether they can establish "adverse

impact."  The test for adverse impact is identical to the objective test for chilling speech set forth

above in subsection C.2.  See Baltimore Sun, 437 F.3d at 416, 419 ("[W]e must measure the

adverse impact against an objectively reasonable plaintiff.").  Thus, with regard to the plaintiffs'

chilling speech and retaliation claims, the central question is "whether a similarly situated person

of 'ordinary firmness' reasonably would be chilled" by the conduct alleged "in light of the

circumstances presented in [this] particular case."  Id. at 416.  Additionally, because the

government conduct alleged is merely speech, the plaintiffs must establish that the defendants'

statements were 'threatening, coercive, or intimidating so as to intimate that punishment,

sanction, or adverse regulatory action will imminently follow.'"  Id. at 417 (emphasis added)

(quoting Suarez, 202 F.3d at 689).

## 4. Analysis

The plaintiffs have failed to advance facts sufficient to withstand a motion to dismiss with

regard to their First Amendment claims.  The Court finds, for several reasons, that a similarly

situated worker or union organizer of ordinary firmness would not reasonably be chilled by the



defendants' statements.  First, most of the comments alleged are general, broad, political pronouncements.  Statements such as, "we are going to fight the unions," "we are a right-to-work state[;] [w]e keep the unions out," "I don't like the unions . . . . I will do everything I can to defend that fact that we are a right-to-work state," and "this is an anti-union administration," communicate the administration's general political opposition to unions, but they do not convey a threat of any specific action.

The only clue as to how the defendants intend to "keep the unions out" is a repeated reference to the state's right-to-work law.  The plaintiffs contend that this is an implicit threat to enforce the right to work law in a "discriminatory" manner; however, there is nothing in the defendants' statements to support this claim.  To prevail on this argument, the plaintiffs would have this Court implicitly accept the flawed assumption that right-to-work laws only discourage unionization where they are discriminatorily enforced.  This is not the case.  As will be discussed, right-to-work laws disadvantage unions by their very existence because they deny unions the significant advantage of "union shops" and "agency shops," which the NLRA otherwise permits.  A reasonable person who heard the defendants' statements would conclude that (1) the Haley administration is politically opposed to unions; (2) the administration will support and enforce South Carolina's right-to-work law; and (3) the defendants expect that this will maintain and promote the state's reputation as an employer-friendly, right-to-work state—an atmosphere in which unions are unlikely to gain traction.  These facts are part and parcel of Governor Haley's political identity, so the defendants' statements add very little to what a reasonable worker or union organizer could have easily inferred about the Haley administration's stance on labor issues.  The plaintiffs would have this Court enjoin a sitting Governor for



confirming what reasonable people would expect—that the Haley administration is politically opposed to organized labor.

Although the defendants were more specific in alluding to potential labor issues at the Boeing plant in North Charleston, their comments still cannot be characterized as threats. Templeton, whose comments about Boeing were arguably the most specific, said, "[W]e will do everything we can to work with Boeing and make sure that their workforce is taken care of, that they run efficiently, and that we don't add anything unnecessarily." Following her confirmation, Templeton said, "Let me be very clear . . . this is an anti-union administration. We don't want Boeing or anybody else to introduce extra bureaucracy into the administration." Compl. ¶ 25. These statements indicate that Templeton does not want workers at the Boeing plant to unionize. They do not, however, convey any threat of prosecution or regulatory punishment to unions, union organizers, or workers.

Second, rhetoric of the general type attributed to the defendants in this case is both pervasive and mundane. For better or worse, politicians can be expected to take sides on virtually any issue that captures the public's attention. Elected officials and their political appointees regularly promise to "resist," "fight," or "stand up to" various causes, organizations, and ideas with which they disagree. If courts were to treat such pronouncements as threats and were to entertain First Amendment challenges to the type of political theatrics alleged here, they would indeed "'plant the seed of a constitutional case' in 'virtually every' interchange." Baltimore Sun, 437 F.3d at 415-16 (quoting Connick, 461 U.S. at 148-49). For this reason, courts must draw a distinction between mere political rhetoric and actual threats.

Third, the defendants' statements are not supported by any specific allegations of conduct. Although a threat need not be corroborated by action to be actionable, a nebulous statement



combined with action may communicate a threat that words alone would not convey.  For example, in <u>Blankenship v. Manchin</u>, 471 F.3d 523 (4th Cir. 2006), Blankenship, the president of Massey Energy, publicly opposed West Virginia Governor Joe Manchin's proposal to increase the coal severance tax.  About a week before a referendum on the proposal, Manchin allegedly remarked to reporters, "I think that [additional scrutiny] is justified now, since [Blankenship] has jumped in there [the bond debate] with his personal wealth trying to direct public policy." <u>Blankenship</u>, 471 F.3d at 525.  The voters rejected Governor Manchin's proposal, and less than a week later, he allegedly ordered members of his staff to meet with regulatory officials to investigate potential safety concerns in connection with a coal silo Massey had already obtained approval to build.  <u>Id.</u> at 526-27.  Affirming the district court's refusal to dismiss Blankenship's § 1983 action, the Fourth Circuit observed that "the actual regulatory scrutiny that Massey experienced shortly after the article [containing the Governor's comments] appeared strongly supports interpreting Manchin's remarks as a threat of increased regulatory scrutiny."  <u>Id.</u> at 529; <u>see also</u> <u>Bantam Books</u>, 372 U.S. at 62-63 (commission not only produced a list of "objectionable publications," but also distributed the list to local police departments).  In contrast, the plaintiffs in this case have not alleged a single act of adverse regulation to bolster their claims that the defendants' statements are, in fact, threats.

　　　　Finally, the Court finds that the plaintiffs have failed to plead facts sufficient to meet the heightened standard that applies where the activity alleged is merely speech.  The statements alleged are not "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow."  <u>Baltimore Sun</u>, 437 F.3d at 417 (quoting <u>Suarez</u>, 202 F.3d at 689).  If the word "imminently" is to be given any meaning at all, the statements alleged must be more specific than the broad political pronouncements alleged here.



Taken together, these factors convince this Court that the defendants' statements would not reasonably deter workers or union organizers of ordinary firmness from exercising their First Amendment rights. A reasonable person in the position of the plaintiffs would understand the defendants' statements as political rhetoric intended to highlight the state's management-friendly right-to-work laws, not as a threat of imminent regulation. The people of South Carolina elected Nikki Haley to serve as their Governor, and she and her administration are expected and entitled to address issues of public concern. On the other hand, the defendants' rhetoric is forceful and sharp, and the plaintiffs' concerns about its impact are understandable. Considerations of fairness, or at least a respect for its appearance, might have counseled the defendants to have held their tongues. But this Court does not exist to ensure that public officials present themselves as the impartial authorities some might wish them to be. Accepted as true and construed in favor of the plaintiffs, the facts alleged do not give rise to a § 1983 action for violation of the First Amendment.

**D. NLRA Claims**

The plaintiffs' complaint alleges that the defendants "have declared and are maintaining a state policy of opposing workers' advocacy of and association in unions, and a state policy of opposing the advocacy and associational activity of unions within the state of South Carolina." Compl. ¶ 2. The Court questions whether the defendants' statements alone are sufficient to give rise to a "state policy." Even if the statements are sufficient to create a state policy of discouraging unionization through South Carolina's right-to-work law, such a policy is not necessarily preempted by the NLRA. As the Court will explain, Congress has granted the states the right to determine whether unions will enjoy certain advantages that are permitted but not required under the NLRA. The Supreme Court has specifically affirmed the states' authority to



enforce the central provisions of right-to-work laws, such as the South Carolina statute referenced by the defendants. Neither the plaintiffs' factual allegations nor the defendants' statements allow this Court to infer that it is plausible that the defendants have announced or are enforcing a policy in violation of the NLRA. In the absence of an allegation that the defendants have engaged in some form of actual regulation, the plaintiffs' claims are premature, as the Court declines to find that the NLRA preempts mere political speech.

**1. Legal Background**

Section 7 of the NLRA guarantees workers the right to form unions and bargain collectively. It provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157. The federal government and the states are specifically excluded from regulation under the NLRA. See 29 U.S.C. § 152. Although the act lacks a specific pre-emption clause, the Supreme Court has "held that Congress implicitly mandated two types of pre-emption": "Garmon pre-emption" and "Machinists pre-emption." Chamber of Commerce of U.S. v. Brown, 554 U.S. 60, 65 (2008).

In San Diego Bldg. Trades Council v. Garmon, the Supreme Court explained that "[w]hen an activity is arguably subject to [§] 7 or [§] 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board . . . ." 359 U.S. 236, 245 (1959). Garmon pre-emption "maintain[s] uniformity in the administration of the federal regulatory jurisdiction," Golden State Transit Corp. v. City of Los Angeles, 493



U.S. 103, 110 (1989) (<u>Golden State II</u>), by "preclud[ing] state interference with the National

Labor Relations Board's interpretation and active enforcement of . . . the NLRA." <u>Chamber of

Commerce</u>, 554 U.S. at 65 (quoting <u>Golden State Transit Corp. v. City of Los Angeles</u>, 475 U.S.

608, 613 (1986) (<u>Golden State I</u>)).

By contrast, <u>Machinists</u> pre-emption prohibits state and federal governmental entities,

including the NLRB, from regulating "conduct left by Congress to the free play of economic

forces." <u>Lodge 76, Int'l Ass'n of Machinists v. Wis. Emp't Relations Comm'n</u>, 427 U.S. 132,

147 (1976). "The <u>Machinists</u> rule creates a free zone from which all regulation, 'whether federal

or State,' is excluded." <u>Golden State II</u>, 493 U.S. at 110 (quoting <u>Machinists</u>, 427 U.S. at 153).

The critical inquiry is "whether the exercise of plenary state authority to curtail or entirely

prohibit self-help would frustrate effective implementation of the Act's processes." <u>Golden State

I</u>, 475 U.S. at 615 (quoting <u>Machinists</u>, 427 U.S. at 147-48) (quotation marks omitted).

"[N]ot all state regulation of labor relations is preempted by the current provisions of the

NLRA." <u>Rum Creek Coal Sales, Inc. v. Caperton</u>, 971 F.2d 1148, 1153 (4th Cir. 1992) (<u>Rum

Creek II</u>). In 1947 Congress passed the Taft-Hartley Act, which amended the NLRA. Among

other changes, Congress added § 14(b), which affirmed that states may prohibit employers from

requiring that their employees join a union (a "union shop") or pay union dues (an "agency

shop") in order to keep their jobs. <u>See</u> 29 U.S.C. § 164(b). These so-called "right-to-work"

laws, which outlaw union security agreements (union or agency shops), have been upheld as

constitutional. <u>See</u> <u>Lincoln Fed. Labor Union No. 19129 v. Nw. Iron & Metal Co.</u>, 335 U.S.

525, 530-37 (1949). Furthermore, the Supreme Court has held that the enforcement of these

laws is not preempted by the NLRA. Noting the apparent conflict between right-to-work laws

and the exclusive jurisdiction of the NLRB, the Court explained that the "conflict" was



"sanctioned by Congress with directions to give the right of way to state laws . . . ." Retail

Clerks Int'l Ass'n, Local 1625 v. Schermerhorn, 375 U.S. 96, 103 (1963) (Retail Clerks II). As

the Court observed: "Congress . . . chose to abandon any search for uniformity in dealing with

the problems of state laws barring the execution and application of agreements authorized by [§]

14(b) and decided to suffer a medley of attitudes and philosophies on the subject." Id. at 104-

105 (emphasis added).

**2. Analysis**

The plaintiffs argue that the defendants' use (or anticipated use) of South Carolina's

right-to-work law is preempted by the NLRA.  The plaintiffs cite Livadas v. Bradshaw, where

the Supreme Court held that the NLRA preempts state rules that predicate the receipt of benefits

"on refraining from conduct protected by federal labor law . . . ."  512 U.S. 107, 116 (1994); see

also Golden State I, 475 U.S. at 618-20 (holding that a city may not condition franchise renewal

upon settlement of a labor dispute).  Additionally, the plaintiffs note that the Livadas Court

rejected the argument "that the NLRA prohibits only state action closely analogous to conduct

that would support an unfair labor practice charge if engaged in by a private employer," holding

that "the Act sometimes demands a more scrupulous evenhandedness from the States."  512 U.S.

at 118 n.12.

The plaintiffs also rely on Rum Creek II, where the Fourth Circuit held that the NLRA

preempted West Virginia's "interpretation and application" of its "Neutrality Statute."  The

Neutrality Statute prohibited police officers from assisting either party in a labor dispute.  During

such a dispute, the Governor and the police issued a memorandum instructing officers to prevent

labor protestors from obstructing public roads, but not to interfere with protestors obstructing

private roads until such time as the owners of the roads obtained court orders for their removal.



Strikers barricaded a private bridge on their employer's property, making it impossible for the employer to receive materials essential to its operation, and the police refused to intervene. The employer challenged the application of the Neutrality Statute, and the Fourth Circuit found that it was preempted by the NLRA. Citing <u>Machinists</u> and its progeny, the Court of Appeals reasoned that the state's refusal to enforce its otherwise applicable trespass law in the context of a labor dispute interfered with the employer's "federally protected rights to withstand a strike." <u>Id.</u> at 1154.

The matter at hand is distinguishable from these cases. In <u>Livadas,</u> the state applied a generally applicable law in a manner that specifically discriminated against a union worker. In <u>Rum Creek II</u>, the state discriminated against management by refusing to apply a generally applicable law. Congress has not granted states the authority to use such laws to affect the balance of power between management and labor, and thus the application of such laws for that purpose is preempted by the NLRA. Conversely, Congress has specifically authorized states to affect the balance of power between management and labor by choosing whether to prohibit union security agreements through the enactment of right-to-work laws. In delegating this authority to the states, Congress made a clear choice to "suffer a medley of attitudes and philosophies on the subject." <u>Retail Clerks II</u>, 375 U.S. at 105. Thus, the defendants are permitted to maintain and enforce the state's prohibition on union security agreements. Furthermore, nothing prohibits the defendants from characterizing the state's right-to-work status as "pro-business" or "anti-union" or from claiming that their enforcement of this law "keep[s] the unions out" or "protects workers from having to join a labor union."[2]

---

[2] Governor Haley and Director Templeton are hardly the first public officials to suggest that South Carolina's right-to-work law promotes an environment that favors management. A 1987 opinion issued by the Attorney General of South Carolina contained the following language:



As previously discussed, South Carolina's right-to-work law includes more than just a prohibition on union security agreements. It also bars employers from discriminating against union-affiliated workers and prohibits threats and certain forms of picketing for the purpose of interfering with an individual's right to work. See S.C. Code Ann. §§ 41-7-30, 70. The state's authority to enforce these provisions is less clear.[3] See, e.g., Local No. 438 Constr. & Gen. Laborers' Union v. Curry, 371 U.S. 542, 546 (1963) (holding that a Georgia court lacked the authority to enjoin picketing in violation of Georgia's right-to-work law because the conduct alleged was arguably an unfair labor practice within the exclusive jurisdiction of the NLRB); Friendly Soc'y of Engravers v. Calico Engraving Co., 238 F.2d 521, 523-24 (4th Cir. 1956) (holding that a labor union suing under South Carolina's right-to-work law could not recover against an employer who terminated workers for joining the union because the conduct alleged was an unfair labor practice within the exclusive jurisdiction of the NLRB). Thus, the question of whether a state may use its right-to-work law to discourage unionization is not subject to a simple yes or no answer because the answer depends on which particular provision of the right-to-work law is being applied and the details of its application. In the absence of a particular application of the law, the analysis is premature.

Unlike the plaintiffs in Livadas and Rum Creek II, the plaintiffs in this case have not alleged that the defendants have conditioned the receipt of benefits on the recipient's union or

---

"The purpose of our Right to Work Statute is not only to preserve the individual freedom of working men and women in South Carolina, but also to encourage industrial development in this State. So long as the Right to Work Law remains on the books and is effective, such sends a strong signal to industries who may contemplate locating in South Carolina that this State offers a favorable climate for industrial location and development . . . . [I]t is crucial to our industrial growth in South Carolina that the Right to Work Law be interpreted in light of its original intent and purpose." 1987 S.C. Op. Atty. Gen. 270, 1987 WL 245510, at *5 (Dec. 22, 1987).

[3] The purpose of this discussion is not to explicitly distinguish between permissible and impermissible applications of the right-to-work law. Such questions are not properly before this Court because the plaintiffs have not challenged any particular application of the law.

nonunion status or identified a single instance in which the defendants actually enforced the right-to-work law, or any other state law, in a way that burdened the plaintiffs' rights under the NLRA. Rather, the plaintiffs would have this Court expand the NLRA to preempt political speech or a public stance that is hostile to unions and to prevent public officials from taking sides with regard to a labor dispute.

The plaintiffs have not directed this Court to a single case where any court has found that the NLRA preempts a state official's statements or public stance on labor issues.[4]  In considering whether the defendants' public statements alone are sufficient to violate the NLRA, the Court is mindful that "[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality." Int'l Ass'n of Machinists v. Street, 367 U.S. 740, 749 (1961). Interpreting the NLRA to forbid the type of broad, politically-charged statements alleged in this case would raise significant First Amendment questions. See Amalgamated Transit Union, Div. 819 v. Byrne, 568 F.2d 1025, 1042 (3d Cir. 1977) (en banc) (Adams, J., dissenting) ("The state administrators here are charged with having expressed themselves in a manner violative of the NLRA. The first amendment's protection of expression traditionally has been of overriding significance in safeguarding public speech about political issues of great concern to citizens, and the matters involved in this case certainly fit within such a category."). This Court has not been presented with any evidence to suggest that Congress intended the NLRA to sweep so broadly, and thus the Court need not address whether such an interpretation of the NLRA is compatible with the First Amendment.

---

[4] The defendants have identified a few instances where the NLRB has held that a politician's statements urging workers to join a union did not amount to third party interference requiring a new election. See Chipman Union, Inc., 316 N.L.R.B. No. 107 (1995); Affiliated Computer Servs., Inc., 355 N.L.R.B. No. 163 (2010). The Court agrees with the plaintiffs that these cases are distinguishable from the instant action on several grounds, and therefore, are of limited persuasive value.



In short, the NLRA preempts regulation—not rhetoric.  The plaintiffs have not alleged that the defendants have taken any action that qualifies as actual regulation, or that they have ever applied the "state policy" that they allegedly announced.  Thus, the plaintiffs have failed to state a claim under the NLRA, and their first cause of action is accordingly dismissed.

## E.  Fourteenth Amendment Claims

The plaintiffs' fourth and fifth causes of action allege that the defendants violated the plaintiffs' rights to equal protection and due process under the Fourteenth Amendment.  As the Court has repeatedly noted, the plaintiffs have failed to allege any actual regulation, so these claims fail for the reasons already discussed.

### III.  CONCLUSION

The plaintiffs claim that Governor Haley and Director Templeton are interfering with the unions' right to advocate for collective bargaining and the workers' right to organize.  However, beyond labels and conclusions, their complaint does not allege that the defendants have done anything but talk.  For words alone to support a § 1983 claim for violation of the First Amendment, they must constitute coercion, intimidation, or an imminent threat of adverse action.  This standard is necessarily rigorous to protect the First Amendment rights of public officials, and the plaintiffs' allegations fall short of its requirements.  The NLRA clearly preempts conflicting state regulation; however, it does not preempt strict enforcement of a right-to-work law (at least the prohibition on union security agreements) or the expression of political animosity toward unions.  The plaintiffs should rest assured that if the defendants actually infringe their rights through imminent threats or retaliatory action, the federal courts stand ready to grant relief.  In this case, however, the allegations of the plaintiffs' complaint fail to state a



claim for which relief can be granted.  Accordingly, the defendants' motion to dismiss is hereby

**GRANTED**.  The defendants' motion to strike is **MOOT**.

**AND IT IS SO ORDERED.**

**C. WESTON HOUCK**
**UNITED STATES DISTRICT JUDGE**

August ___, 2011
Charleston, South Carolina